UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | ) | |
| EDWIN MOLINARI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-12293-JEK |
| | ) | |
| JOCKEYS' GUILD, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS**

**KOBICK, J.**

Plaintiff Edwin Molinari, a disabled jockey who is proceeding *pro se*, filed this suit against

defendant Jockeys' Guild, Inc., a nonprofit organization that represents jockeys. Molinari alleges

that the Guild falsely reported as income funds that it paid to him pursuant to a Massachusetts

statute, M.G.L. c. 128A, § 5, that sets aside certain gambling revenues for the purpose of providing

health and welfare benefits to active, disabled, and retired jockeys. Molinari also alleges that the

Guild helped the Massachusetts Gaming Commission "cover up" its failure to authorize annual

disbursements under another statute, M.G.L. c. 23K, § 60, that similarly allocates a portion of

certain gambling revenues to provide health insurance, life insurance, and other benefits to active

and disabled jockeys. Construed liberally, the complaint asserts claims against the Guild for the

fraudulent filing of Form 1099s with the Internal Revenue Service ("IRS"), in violation of 26

U.S.C. § 7434; breach of the duty of fair representation; and intentional or negligent infliction of

emotional distress.

Pending before the Court is the Guild's motion to dismiss the complaint for failure to state a claim. For the reasons that follow, that motion will be granted. Molinari does not state a plausible claim for fraudulent filing of Form 1099s because, under federal tax law, the Chapter 128A funds that Molinari received are presumptively treated as income even though they are designated by statute for the provision of health and welfare benefits to jockeys. Nor does Molinari state a claim for breach of the duty of fair representation or infliction of emotional distress. He has not identified any authority imposing on the Guild the duty to demand that the Gaming Commission authorize disbursements under M.G.L. c. 23K, § 60, and he has not plausibly alleged that the Guild helped to "cover up" the Gaming Commission's failure to authorize those disbursements.

## BACKGROUND

### I.      Statutory Framework.

The allegations in this case concern the Guild's obligations under two Massachusetts statutes—M.G.L. c. 23K, § 60, and M.G.L. c. 128A, § 5—that provide for the distribution of funds to horsemen's and jockeys' organizations for the purpose of providing healthcare, pension, and welfare benefits to those organizations' members. Horsemen's organizations represent horse owners and trainers, whereas jockeys' organizations represent only jockeys. *See* M.G.L. c. 23K, § 60(c)(iii).

The first statute, M.G.L. c. 23K, § 60, provides for the creation of the Race Horse Development Fund ("RHDF"), which is funded by a portion of the taxes levied on gaming establishments in the Commonwealth. *See id.* § 60(a); *id.* § 55(c). RHDF funds must be "distributed between thoroughbred and standardbred racing facilities" to support the Commonwealth's horse racing industries. *Id.* § 60(b). A five-member "horse racing committee" is tasked with recommending how funds should be distributed between facilities, and its

recommendations are subject to the "final approval" of the Massachusetts Gaming Commission. *Id.* Section 60(c) establishes the process for distributing Commission-approved funds. As relevant here, 4% of the distributed funds must be deposited into a bank account held by the horsemen's organization representing the owners and trainers at a given facility, and that amount must "be used to fund health and pension benefits" for that organization's members. *Id.* § 60(c)(iii). The designated horsemen's organization must, in turn, pay a portion of its disbursement to the jockeys' organization representing jockeys at the same racing facility. *Id.* Although the horsemen's organization makes this payment, it is the Gaming Commission that must "determine how much shall be paid annually . . . for health insurance, life insurance or other benefits to active and disabled thoroughbred jockeys." *Id.*

The second statute, M.G.L. c. 128A, § 5, requires the Gaming Commission to deposit, into an account that it controls, the revenue derived from certain taxes, fees, and assessments levied on licensed dog and horse racing facilities in the Commonwealth. Section 5(h), which governs how those funds must be spent, requires that $65,000 be paid annually to a jockeys' organization "for the purpose of providing health and other welfare benefits to active, disabled or retired jockeys." M.G.L. c. 128A, § 5(h)(4). The designated organization may distribute that sum among the jockeys it represents without obtaining further approval from the Commission, but it must submit an annual report "detailing its expenditures from said allocations" to the Massachusetts "house and senate committees on ways and means." *Id.*

## II.    Factual Allegations.

The following facts, which are drawn from the complaint and the documents incorporated therein, are treated as true for purposes of the motion to dismiss. *See Lanza v. Fin. Indus. Regul. Auth.*, 953 F.3d 159, 161 (1st Cir. 2020).

Molinari is a disabled jockey who used to ride at the Suffolk Downs racetrack in Boston, Massachusetts. ECF 1, at 6. He is a member of the Guild, a nonprofit organization that represents jockeys throughout the United States. *Id.*; *see* ECF 13, at 1. The New England Horsemen's Benevolent and Protective Association, Inc. ("NEHBPA"), which is not a party to this case, is a horsemen's organization that represents owners and trainers of thoroughbred racehorses. *See* Art. III, § 1, Constitution and Bylaws, New England Horsemen's Benevolent and Protective Association (rev. June 7, 2019), https://perma.cc/EB22-G9YA.

At all times relevant to this action, the Guild has been responsible for distributing the $65,000 that M.G.L. c. 128A, § 5(h)(4) sets aside each year for the purpose of providing health and welfare benefits to jockeys (the "Chapter 128A funds"). ECF 1, at 6; *see, e.g.*, ECF 17-1, at 1. The Guild has distributed a portion of these funds to Molinari for several years. ECF 1, at 6. For example, it issued Molinari a check for around $2,400 in 2020, ECF 17-2, at 1, and a check for around $4,300 in 2023, ECF 17-1, at 1. Each year that the Guild has distributed Chapter 128A funds to Molinari, it has instructed him to submit documentation for any out-of-pocket medical expenses that he incurred during the previous calendar year. *See, e.g.*, ECF 17-1, at 1; ECF 17-2, at 1. The Guild has further instructed Molinari that unless he submits documentation for medical expenses that equal or exceed the amount of the funds he received, it will issue him an IRS Form 1099 reporting those funds as income. *See* ECF 1, at 6; ECF 17-1, at 1; ECF 17-2, at 1. Molinari does not allege that he ever submitted expense documentation to the Guild. *See* ECF 1, at 6. The Guild has, accordingly, issued him a Form 1099 each year reporting as income the Chapter 128A funds it distributed to him. *See id.*

The NEHBPA represents horse owners and trainers at Suffolk Downs. *See id.* The NEHBPA is the entity responsible for paying the Guild the portion of RHDF funds allocated by

the Gaming Commission "for health insurance, life insurance or other benefits to active and disabled thoroughbred jockeys." M.G.L. c. 23K, § 60(c)(iii). From 2012 to 2019, the Commission did not determine the portion of these funds that should be paid to the Guild, and Molinari consequently did not receive any RHDF funds during that period. *See* ECF 1, at 6. Molinari repeatedly asked the Guild to help him retroactively obtain the RHDF funds that he did not receive between 2012 and 2019, but it has not done so. *Id.* Molinari alleges that the Guild, the NEHBPA, and the Gaming Commission have "covered up" the Commission's failure to comply with its obligation to determine the portion of RHDF funds that should have been paid to the Guild between 2012 and 2019. *See id.*

Molinari filed this suit against the Guild in September 2024. ECF 1. Construed liberally, the complaint asserts three claims: (1) a violation of 26 U.S.C. § 7434, for falsely reporting income to the IRS on Form 1099s; (2) a breach of the duty of fair representation, in violation of federal law; and (3) intentional or negligent infliction of emotional distress, in violation of Massachusetts law. ECF 1, at 6. The Guild moved to dismiss the complaint for failure to state a claim in November 2024. ECF 12. After receiving Molinari's opposition, the Guild's reply, and Molinari's sur-reply, the Court held a hearing and took the motion under advisement. ECF 17, 20, 30, 38.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must determine "'whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintif[f], the complaint states a claim for which relief can be granted.'" *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011)). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. Where, as here, the plaintiff is proceeding *pro se*, the Court will construe his complaint liberally, accept as true all well-pled, non-conclusory allegations in the complaint, and draw all reasonable inferences in his favor. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 13 (1st Cir. 2004).

## DISCUSSION

### I.    Reporting of Income to the IRS.

Molinari first contends, without specifying a cause of action, that the Guild is liable for falsely reporting as income the Chapter 128A funds that it distributed to him. The Court construes this as a claim for the fraudulent filing of information returns under 26 U.S.C. § 7434. *See Ahmed v. Rosenblatt*, 118 F.3d 886, 890 (1st Cir. 1997) ("The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was imperfectly pled."). Section 7434(a) provides that "[i]f any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return." 26 U.S.C. § 7434(a). A Form 1099 is an information return. *See, e.g.*, *Woodsum v. Comm'r*, 136 T.C. 585, 588 (2011).

To state a claim under 26 U.S.C. § 7434, Molinari must plausibly allege that "(1) the [Guild] filed an information return on his . . . behalf, (2) the return was false as to the amount paid, and (3) the [Guild] acted willfully and fraudulently, which here is equivalent to knowingly or recklessly." *Doherty v. Turner Broad. Sys., Inc.*, 72 F.4th 324, 326 (D.C. Cir. 2023). Molinari

claims that because the Chapter 128A funds are designated "for the purpose of providing health and other welfare benefits to active, disabled or retired jockeys," M.G.L. c. 128A, § 5(h)(4), the Guild erred in reporting those funds as income on the Form 1099s it issued to him, *see* ECF 1, at 6. In Molinari's view, the term "income" refers only to "money or value that an individual or business entity receives in exchange for providing a good or service or through investing capital." ECF 17, at 4. Because the Guild is not his employer and was simply distributing funds allocated by statute, Molinari contends, the Guild lacked any basis to report the Chapter 128A funds as income.

Molinari's definition of "income" may be consistent with colloquial usage, but that term is defined more expansively under federal tax law. At bottom, income is any "money or other form of payment that one receives." Income, Black's Law Dictionary (12th ed. 2024); *see* 26 U.S.C. §§ 61(a)(1)-(14) (enumerating 14 examples of "gross income," including compensation for services, royalties, pensions, and income from an interest in an estate or trust). Income is not, as Molinari contends, limited to payments that one receives "in exchange for providing a good or service." ECF 17, at 4. An award of punitive damages, for example, constitutes income for federal tax purposes, even though punitive damages are not awarded in exchange for the recipient's provision of goods or services. *See Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955) ("The mere fact that the payments were extracted from the wrongdoers as punishment for unlawful conduct cannot detract from their character as taxable income to the recipients."). Under federal law, "[t]he general rule is that all income is taxable unless specifically excluded from gross income." *Wheeler v. United States*, 400 F. Supp. 2d 300, 302 (D. Mass. 2005) (citing *Kane v. United States*, 43 F.3d 1446, 1451 (Fed. Cir. 1994)); *see Glenshaw Glass*, 348 U.S. at 429-30 (similar). And gross income encompasses "all income from whatever source derived." 26 U.S.C.

§ 61(a). The Chapter 128A funds that the Guild disbursed to Molinari thus constitute income unless a specific exception applies, and Molinari has not identified any such exception. *See* ECF 1, at 6.

The Guild, for its part, notes that "amounts received by an employee through accident or health insurance for personal injuries or sickness *shall be included in gross income* to the extent such amounts (1) are attributable to contributions by the employer which were not includible in the gross income of the employee, or (2) are paid by the employer." 26 U.S.C. § 105(a) (emphasis added). "Amounts received from a sickness and disability fund for employees" maintained by a state are treated as amounts received through accident or health insurance for purposes of this statute. *Id.* § 105(e)(2). Section 105(b), however, excludes from gross income amounts "paid, directly or indirectly, to the taxpayer to reimburse the taxpayer for expenses incurred by him for" his medical care. *Id.* § 105(b); *see* 26 C.F.R. § 1.105-2 (exemption applies only where funds "are paid *specifically* to reimburse the taxpayer for expenses incurred by him for the prescribed medical care" (emphasis added)). The Guild informed Molinari that, per 26 U.S.C. § 105, it would report the Chapter 128A funds that it distributed to him each year as income unless he provided documentation for out-of-pocket medical expenses equal to or greater than the amount of funding he received. *See* ECF 1, at 6; ECF 17-1, at 1. Because Molinari never submitted such documentation, the Guild argues, it was required to report the funds it distributed to him as income.

It is not clear that Section 105 applies in this context, because that statute pertains to amounts that employees receive from employer-funded accident and health plans or state-funded sickness and disability funds, and Molinari does not allege that the Guild or the Commonwealth is or was his employer. *See* 26 U.S.C. §§ 105(a), (e)(2); *see also id.* § 105(g) (the term "employee" does not include self-employed individuals). The Court need not resolve this issue, however,

because either way, Molinari cannot state a claim under Section 7434 against the Guild. If Section

105 does apply, Molinari has not alleged that he used the Chapter 128A funds he received from

the Guild to reimburse himself for specific out-of-pocket medical expenses, as is required to

exclude those funds from his gross income under Section 105(b). *See* 26 C.F.R. § 1.105-2

("Section 105(b) applies only to amounts which are paid specifically to reimburse the taxpayer for

expenses incurred by him for the prescribed medical care. Thus, section 105(b) does not apply to

amounts which the taxpayer would be entitled to receive irrespective of whether or not he incurs

expenses for medical care."). And even if Section 105 does not apply, Molinari has not adequately

alleged that the funds are otherwise exempted from the definition of "gross income."

The complaint thus fails to identify any plausible basis to infer that the Guild erred by

issuing Molinari Form 1099s that reported his Chapter 128A distributions as income. Molinari is,

accordingly, unable to state a claim under 26 U.S.C. § 7434.

## II.    **Breach of Fair Representation.**

Molinari next contends that the Guild is liable for "bad representation" because it helped

"cover up" the Gaming Commission's failure to authorize the disbursement of RHDF funds

between 2012 and 2019. ECF 1, at 6. The Court construes this allegation, which Molinari does not

tether to a cause of action, as a claim for breach of the duty of fair representation. *See Ahmed*, 118

F.3d at 890. A union, which is "'the exclusive bargaining representative of . . . employees,'" has

"'a statutory duty fairly to represent all of those employees both in its collective bargaining . . .

and in its enforcement of the resulting collective bargaining agreement.'" *Emmanuel v. Int'l Bhd.*

*of Teamsters, Loc. Union No. 25*, 426 F.3d 416, 419-20 (1st Cir. 2005) (quoting *United*

*Steelworkers of Am. v. Rawson*, 495 U.S. 362, 372 (1990)). A union breaches its duty of fair

representation "by acting discriminatorily, in bad faith, or arbitrarily toward a union member," and

"[p]roof of any of these bad acts will suffice to establish a claim." *Id.* at 420. "'A union acts in bad faith when it acts with an improper intent, purpose, or motive,' and 'bad faith encompasses fraud, dishonesty, and other intentionally misleading conduct.'" *Good Samaritan Med. Ctr. v. Nat'l Lab. Rels. Bd.*, 858 F.3d 617, 630 (1st Cir. 2017) (brackets omitted) (quoting *Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 126 (2d Cir. 1998)).

For at least two reasons, Molinari has not stated a claim for breach of the duty of fair representation. First, a claim for breach of the duty of fair representation will lie only against a union acting as the exclusive bargaining representative for its constituent employees. *See Emmanuel*, 426 F.3d at 419-20. Molinari has not, however, alleged that the Guild is a union, as compared, for example, to a trade association or business league, nor has he alleged that the Guild serves as his bargaining representative. *See* ECF 1, at 6. Second, even assuming that the Guild is a union representing Molinari, the complaint's allegations are too conclusory to state a claim for breach of the duty of fair representation. Molinari contends that the Guild acted in bad faith by helping to "cover up" the Gaming Commission's failure to authorize the distribution of RHDF funds between 2012 and 2019. *See id.* But, as the Guild argues, Molinari has not alleged any specific facts to substantiate his claim of a cover up. He has not, for example, alleged any facts concerning how the Guild covered up the Commission's failure to authorize the disbursement of RHDF funds or how it worked with the Commission and the NEHBPA to do so. Molinari concedes, moreover, that only the Gaming Commission had the power to authorize RHDF disbursements, and he does not allege that the Guild had any ability to force the Commission to authorize distributions. *See id.*; M.G.L. c. 23K, § 60(c)(iii) ("the commission shall determine how much shall be paid annually by the horsemen's organization to the thoroughbred jockeys or standardbred drivers organization"). Nor has he identified any authority imposing on the Guild the

10

duty to demand that the Commission authorize RHDF distributions. *Cf. Emmanuel*, 426 F.3d at 420 (noting union's duty to "conduct at least a minimal investigation into an employee's grievance" (quotation marks omitted)). Molinari's claim for breach of the duty of fair representation must therefore be dismissed.

III.   **Emotional Distress Claim.**

Molinari finally claims that the Guild is liable for the emotional distress that he has suffered as a result of the Guild "kicking [him] back and forth with the NEHBPA and the [Gaming Commission] to prevent [him] from getting the funds" he is owed under M.G.L. c. 23K, § 60. ECF 1, at 6. He does not specify whether he is asserting a claim for the negligent or intentional infliction of emotional distress, but the Guild contends that the complaint fails to state either claim.

"To prevail on a claim of intentional infliction of emotional distress, the plaintif[f] must be able to establish '(1) that the defendant intended to cause, or should have known that [its] conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that [it] caused the plaintiff['s] distress; and (4) that the plaintif[f] suffered severe distress.'" *Jones v. Maloney*, 74 Mass. App. Ct. 745, 750 (2009) (bracketed text altered) (quoting *Howcroft v. Peabody*, 51 Mass. App. Ct. 573, 596 (2001)). While Molinari allegedly suffered emotional distress as a result of the Gaming Commission's failure to authorize RHDF disbursements between 2012 and 2019, he has not plausibly alleged that the Guild caused this distress by engaging in extreme and outrageous conduct. "'To be considered extreme and outrageous, the defendant's conduct must be beyond all bounds of decency and . . . utterly intolerable in a civilized community.'" *Id.* (quoting *Vittands v. Sudduth*, 49 Mass. App. Ct. 401, 410 (2000)). The Guild's alleged failure to help Molinari retroactively obtain RHDF funds for the years during which the Commission failed to authorize disbursements does not, without more, rise to "the level of

shocking malevolence required" to state a claim for intentional infliction of emotional distress. *Okoli v. Okoli*, 81 Mass. App. Ct. 381, 390 (2012) (collecting cases).

"To recover for the tort of negligent infliction of emotional distress, a plaintiff must prove: '(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case.'" *Conley v. Romeri*, 60 Mass. App. Ct. 799, 801 (2004) (quoting *Payton v. Abbott Labs*, 386 Mass. 540, 557 (1982)). "It is fundamental that there must be a showing of a duty of care owed to the plaintiff, because 'there can be no negligence where there is no duty.'" *Id.* (brackets omitted) (quoting *McHerron v. Jiminy Peak, Inc.*, 422 Mass. 678, 681 (1996)). Molinari has not identified any authority imposing on the Guild the duty to demand that the Gaming Commission authorize RHDF distributions. Nor has he alleged that he has suffered a "physical harm manifested by objective symptomatology." *Id.* Molinari is thus unable to state a claim for either intentional or negligent infliction of emotional distress.

## CONCLUSION AND ORDER

For the foregoing reasons, the Guild's motion to dismiss, ECF 12, is GRANTED. The complaint is DISMISSED with prejudice and without leave to amend.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: July 30, 2025